PLEASE CONFORM
AND RETURN

1   Anthony J. Barron, Bar No. 150447
2   abarron@nixonpeabody.com
    Stephanie A. Karnavas, Bar No. 255596
3   skarnavas@nixonpeabody.com
4   NIXON PEABODY LLP
    Los Angeles
5   Gas Company Tower
6   555 West Fifth Street, 46th Floor
    Los Angeles, CA 90013
7   Telephone: (213) 629-6000
8   Fax: (213) 629-6001

9   Gregory P. O'Hara, Bar No. 131963
10  gohara@nixonpeabody.com
    NIXON PEABODY LLP
11  2 Palo Alto Square
12  3000 El Camino Real, Suite 500
    Palo Alto, California 94306
13  Telephone: (650) 320-7700
14  Fax: (650)320-7701

15  Attorneys for Plaintiff
16  FEDERAL DEPOSIT INSURANCE COMPANY
    AS RECEIVER FOR FIRST BANK OF BEVERLY HILLS
17

18              UNITED STATES DISTRICT COURT
19
                CENTRAL DISTRICT OF CALIFORNIA
20

21  FEDERAL DEPOSIT INSURANCE          CV12   03448 DDP   (CWx)
    COMPANY AS RECEIVER FOR FIRST
22  BANK OF BEVERLY HILLS,
                                       **COMPLAINT FOR NEGLIGENCE,**
23                                     **GROSS NEGLIGENCE AND**
                      Plaintiff,       **BREACH OF FIDUCIARY DUTY**
24

25      vs.

26                                     DEMAND FOR JURY TRIAL
    LARRY B. FAIGIN, CRAIG
27  KOLASINSKI, ERIC ROSA, ANNETTE
    VECCHIO, HOWARD AMSTER,
28

[stamp: FILED]
[stamp: CLERK U.S. DISTRICT COURT CENTRAL DIST. OF CALIF. LOS ANGELES   2012 APR 20   PM 1:35   BY _____]

WILLIAM D. KING, STEPHEN
GLENNON, ROBERT KANNER,
KATHLEEN KELLOGG AND JOHN
LANNAN,

                    Defendants.

---

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation ("FDIC") as Receiver for First Bank of Beverly Hills ("FDIC-R"), for its Complaint, states as follows:

### I.   INTRODUCTION

1.     The FDIC-R brings this case in its capacity as Receiver for First Bank of Beverly Hills ("FBBH" or the "Bank"), pursuant to authority granted by 12 U.S.C. § 1821. The FDIC-R seeks to recover losses of at least $100.6 million the Bank suffered because Defendants – ten of its former directors and/or executive officers – negligently, grossly negligently, and in breach of their fiduciary duties approved nine poorly underwritten acquisition, development, and construction ("ADC") and commercial real estate ("CRE") loans (collectively, the "Loss Loans") from March 2006 through July 2007.

2.     In derogation of their duty to engage in "safe and sound" banking practices, Defendants recklessly implemented an unsustainable business model pursuing rapid asset growth concentrated in large high-risk loans without having adequate loan underwriting policies and practices to manage the risk. In addition, Defendants routinely violated the Bank's Loan Policy, thereby improperly approving loans that had little chance of repayment and thus compounding the Bank's risk exposure.

3.     The directors and officers of the Bank were the keepers and architects of the Loan Policy. The Defendants' roles on the Officers' Loan Committee ("OLC"),

-2-

13862424

the Directors' Loan Committee ("DLC") and the Board of Directors required that they ensured compliance with the Loan Policy. By repeatedly ignoring Loan Policy violations that were clear on the face of the Credit Memoranda received by loan approvers prior to voting on loans ("Credit Memo"), the Defendants completely abdicated their responsibilities to ensure that loans were made in accordance with the Bank's Loan Policy and safe and sound banking practices.

4.      In committing numerous breaches of their duties – in some instance for their own personal gain – the Defendants acted clearly unreasonably under the circumstances known to them at the time, and otherwise wholly abdicated their corporate responsibilities by closing their eyes to known risks.

5.      Among the many examples of the Defendants' wholesale abdication of their responsibilities is the willful disregard of the Bank's own Loan Policy that discouraged lending on construction projects with difficult topography. At a minimum, sound banking principles require that potential environmental issues be analyzed before a loan is approved. Ignoring this basic principle that Defendants themselves approved, the Defendants disregarded clear warning signs that would have alerted them to environmental concerns large enough to destroy a project's viability. As a result, large loans were made for a project sitting directly on top of the San Andreas Fault, and on property where the vast majority of the land was ultimately deemed unbuildable due to the Endangered Species Act.

6.      Defendants' willful blindness to the risks and imprudence of their loan decisions is further evidenced in connection with seven of the nine Loss Loans, which were loan participations. In a "loan participation," multiple lenders share the funding of a loan to mitigate their risk on a given lending relationship. One lender takes a role as lead servicer, typically controlling loan monitoring and having final decision-making authority not extended to the other participant lenders. In return, the lead lender receives a servicing fee. Despite the fact that FBBH took a vast majority participation in six of the seven participation loans, incurring at times upwards of 90%

-3-

of the risk, the Bank relinquished lead lender status.  Such acquiescence violated sound banking principles and put the Bank at risk for situations in which the lead lender could make decisions over the Bank's objection, increasing the Bank's risk on the loan.  That risk manifested on several of the Loss Loans, when the lead lenders acted unilaterally and increased the risk of loan failure, to the Bank's detriment.

7.     Compounding an already extremely risky situation, Defendants wholly ignored the Bank's Loan Policy requirement that the Bank perform its own independent due diligence and underwrite the loan as if the Bank was originating a new loan.  In each and every one of the seven participation Loss Loans, Defendants willfully ignored this provision of the Loan Policy, and instead relied on the due diligence conducted by the originating lender.

8.     Defendants' abdication of responsibility rose to a new level of willful blindness when, shortly after receiving significant regulatory criticism concerning the Bank's poor underwriting practices, Defendants approved two large Loss Loans containing the exact same deficiencies the regulators had just criticized.

9.     By approving the Loss Loans despite their myriad obvious deficiencies, the Defendants lined their own pockets when FBBH dividends, boosted by false profits on large problematic loans that were unlikely to be repaid, were upstreamed to the Bank's parent company – of which numerous Defendants were shareholders.  Moreover, Defendant Lannan received a direct financial benefit by ignoring the numerous red flags raised by the ChinaTrust Bank ("CTB") participation loans, approving them regardless, and then accepting a $75,000 referral fee on the very loans he approved.

10.     As members of the OLC, DLC and/or Board of Directors, Defendants each voted to approve at least three of the nine Loss Loans that are addressed in this Complaint, and no Defendant voted against any of the Loss Loans.

11.     The FDIC asserts claims against Defendants in an amount not less than $100.6 million for losses incurred on the nine Loss Loans that were approved in

-4-

1 violation of safe and sound banking principles and contrary to the Bank's own Loan
2 Policy.

3 **II.   BACKGROUND**

4      12.   FBBH opened its doors as Girard Savings and Loan Association on
5 January 1, 1979, in Oakhurst, California.  In 1997, the Bank became a stock savings
6 bank regulated by the Office of Thrift Supervision and changed its name to First Bank
7 of Beverly Hills.  On September 1, 2005, the Bank became a state-chartered
8 commercial bank regulated by the California Department of Financial Institutions
9 ("CDFI"), and the FDIC became the Bank's primary federal regulator.

10      13.   At that time, FBBH was operating out of two branches in California, one
11 in Beverly Hills and one in Calabasas.  In November 2006, management sold the
12 Beverly Hills branch, which was the Bank's main source of core deposits.

13      14.   FBBH was wholly owned by Beverly Hills Bancorp ("BHBC").

14      15.   FBBH originally focused on making loans of $5 million or less secured
15 by stable income-producing properties.  In 2006, the Board began to move
16 aggressively into CRE and ADC loans for residential projects primarily in California
17 and Nevada, funded principally by brokered deposits.

18      16.   Despite the increased risk of these loans, Defendants failed to take
19 measures to improve underwriting or strengthen the Bank's capital position.

20      17.   At the same time that Defendants were supporting these riskier strategies,
21 they also were weakening the Bank's capital position by approving large quarterly
22 dividend payments to the Bank's parent company.

23      18.   On April 24, 2009, the CDFI closed First Bank of Beverly Hills and
24 appointed the FDIC as receiver.

25 **III.   THE PARTIES**

26      **A.   PLAINTIFF**

27      19.   Plaintiff FDIC-R was appointed as Receiver for FBBH on April 24, 2009,
28 by the CDFI.  Pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R succeeded to all

-5-

13862424

rights, titles, powers, and privileges of FBBH, FBBH's shareholders, accountholders, and depositors, including, but not limited to, FBBH's claims against the Bank's former directors and officers as set forth herein.

**B.      DEFENDANTS**

20.      Director and Officer Defendant Larry B. Faigin ("Faigin") was the Bank's Chief Executive Officer ("CEO") and President from June 2006, and a director from April 2001, until FBBH failed.  He served on the DLC during the time that all of the Loss Loans were approved and served on the OLC during his tenure as CEO and President.

21.      Craig Kolasinski ("Kolasinski") served the Bank in different capacities from 2001 through the Bank's closure.  Kolasinski was Executive Vice President ("EVP") and Chief Lending Officer ("CLO") both from October 2001 to February 2005 and from April 2006 to November 2006; EVP and Chief Credit Officer ("CCO") from February 2005 to April 2006; and EVP of Business Development from November 2006 until closure.  He served on the OLC during the time that all of the Loss Loans were approved.

22.      Eric Rosa ("Rosa") joined the Bank in October 2006 as EVP-CLO and left in January 2008.  He served on the OLC during his entire tenure at the Bank.

23.      Annette Vecchio ("Vecchio") served the Bank in different capacities from 1985 until closure.  Vecchio was SVP and Portfolio Manager from March 2002 until April 2006 as well as EVP-CLO from February 2005 to April 2006.  In April 2006, Vecchio became EVP-CCO and remained in that role until the Bank's closure.  She served on the OLC when all of the Loss Loans were approved, but she only became a voting member of the OLC in June 2006.  Vecchio was responsible for underwriting all but one of the Loss Loans, and also voted to approve seven of the Loss Loans.

24.      William D. King ("King") was the Bank's Chairman of the Board from April 2001 until closure.  He served on the DLC when all of the Loss Loans were approved.

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY

13862424

25. Howard Amster ("Amster") was a director from October 2001 until closure. He served on the DLC when all of the Loss Loans were approved.

26. Stephen Glennon ("Glennon") was a director from April 2001 until the Bank failed. Glennon also served as CEO and Chief Financial Officer of BHBC at the same time that he was a director of the Bank. Glennon did not serve on any of the Bank's loan committees, but he approved Loss Loans as a member of the Board.

27. Robert Kanner ("Kanner") was a director from January 2002 until June 2008. He served on the DLC when all of the Loss Loans were approved.

28. Kathleen Kellogg ("Kellogg") was a director from October 2001 until closure. Kellogg did not serve on the loan committees but approved Loss Loans as a member of the Board.

29. John Lannan ("Lannan") was a director from June 2003 until June 2008. He served on the DLC when all of the Loss Loans were approved.

## IV.  JURISDICTION AND VENUE

30. The Court has subject matter jurisdiction over this matter, as actions in which the FDIC-R is a party are deemed to arise under federal law pursuant to 12 U.S.C. § 1811, et seq.; 12 U.S.C. § 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345.

31. This Court has personal jurisdiction over Defendants who are residents of the State of California and/or who at all times conducted the business of the Bank in the State of California.

32. This Court has personal jurisdiction over each of the Defendants named in this action pursuant to California Code of Civil Procedure § 410.10.

33. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the claims and causes of action asserted in this Complaint arose in this district.

## V.  FACTUAL ALLEGATIONS

### A.  FBBH WAS THE SUBJECT OF REGULATORY CRITICISM

34. In January 2007, FDIC regulators identified deficiencies in the lending

-7-

1  practices and supervision of the lending function by the Bank's Board and its
2  management team.  The September 30, 2006 FDIC Report of Examination ("2006
3  RoE") was presented to the Board and senior management on January 8, 2007.  While
4  the composite CAMELS rating in the 2006 RoE was a 2, the examiners' comments
5  were critical of Bank management.[1]

6      35.    In the 2006 RoE, regulators identified critical problems that the Director
7  Defendants failed to address effectively.

8      36.    Among other things, in the 2006 RoE the examiners criticized the Bank's
9  use of non-core funding, lending with high loan-to-value ("LTV") ratios, and improper
10  appraisals.  The examiners were also critical of the Bank's loan participations,
11  including a package of participation loans purchased from CTB.

12      37.    During the 2006 examination, Faigin informed examiners that he would
13  recommend that the Bank cease making cash dividend payments to BHBC for 2007, a
14  recommendation with which the examiners agreed.  In spite of this, the directors
15  approved quarterly dividends totaling $9.6 million in 2007, which amounted to
16  563.38% of the Bank's net operating income.  Several voting directors were large
17  shareholders in BHBC, collectively owning approximately 23% of outstanding shares.

18      38.    Notwithstanding the severity of the criticisms leveled against the Board
19  and senior management in the 2006 RoE, the problems were never addressed in any
20  meaningful way.  In fact, two of the Loss Loans described below were approved after
21  the Bank received the 2006 RoE, yet exhibited many of the same deficiencies
22  identified by regulators.  These two loans alone totaled over $31 million and resulted
23  in over $20 million in losses.

24  ///

25  ///

---

26  [1]     The components of a bank's condition that are assessed in bank examinations include: (C)
27  Capital adequacy, (A) Asset Quality, (M) Management, (E) Earnings, (L) Liquidity and (S)
    Sensitivity to Market Risk.  The rating scale is from 1 to 5, with 1 being strongest and 5 being
28  weakest.

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY

13862424

## B.    FBBH'S LOAN POLICY WAS INADEQUATE AND OTHERWISE NOT FOLLOWED AND ENFORCED BY THE DEFENDANTS

39.    FBBH's Loan Policy provided that loans up to $2 million could be approved by the OLC. The DLC had authority to approve a single loan to an individual borrower in excess of $2 million and up to $12 million, or participation pool loans/multiple loans to one borrower in excess of $2 million and up to the aggregate of $20 million. Loans above these limits had to be approved by the full Board of Directors. The CTB participations were a pool of loans that required full Board approval as they exceeded $20 million in the aggregate; the Board was also required to approve the following Loss Loans: River East Plaza LLC, Las Vegas 215, LLC, Las Vegas Mobil 18, LLC and Acacia Investors, LLC, all of which exceeded $12 million at the time of approval.

40.    Although the Loan Policy and operative committee charters provided no directive concerning the documents that the OLC and DLC were to review when voting on a loan for approval, committee members received Credit Memos prepared by the Credit Administration department, summarizing the loan information, information on the subject property, background and finances of borrowers, and general conclusions and loan recommendations.

41.    The Loan Policy provided that the Bank's commercial real estate lending activity was to be "concentrated in major metropolitan areas in California, Arizona, Nevada, Oregon and Washington." The Bank's maximum LTV ratio, which is the amount of the loan as a percentage of the total appraised value of the subject, for such loans was 80%.

42.    Pursuant to the Loan Policy, the Bank, at relevant times, was to "offer[] financing on income properties" falling into the following categories: general use, mixed use, multifamily, retail, industrial, office and professional, limited use, and special purpose. Aside from those categories, the policy noted that FBBH "does not offer other types of loans."

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY

13862424

43.     With respect to participation loans, FBBH's Loan Policy required that participations be "viewed with as much care as direct extensions of credit to borrowers.  The same information normally obtained to evaluate the inherent risk in lending directly to a customer will be obtained in relation to participations.  In addition, sufficient due diligence will be performed with regard to the Lead Bank, as well as the borrower."

44.     FBBH's 2005 Construction Loan Policy stated that "FBBH does not provide general construction financing," except "on a limited basis in the Southern California area."  The section was intended to "serve as a guide in the controlled handling of 'Earn-Out' funds associated with commercial bridge loans, hereafter referred to as 'construction loans.'"  The Construction Loan Policy was changed on August 31, 2006 to acknowledge that the Bank was engaging in construction lending and to widen the geographic area for such lending.  The substance of the Construction Loan Policy, however, did not otherwise materially change and, therefore, still did not address loans like the Loss Loans.

45.     The Bank's Construction Loan Policy stated that "[t]he Bank does not make construction loans for the purpose of building the following types of property: (DLC must approve any exception to this policy) . . . . Properties with difficult topography (e.g., steep hillside or excessive, soil import)."

46.     Pursuant to the Loan Policy, underwriters on construction loans were to "underwrite and evaluate the construction loan prudently and ensure that there are sufficient funds to complete the improvements from loan proceeds and borrower's equity.  Special attention will be paid to all fees, tenant improvement holdbacks, reserves, insurance, bonds, the amount and method of construction loan disbursements, and the following variables that are particularly important to construction loans: . . . Bureaucratic difficulties with government building and planning departments . . . . Soil instability or toxicity . . . . Extensions, delays and the additional carrying costs and costs of construction caused by delays . . . ."

-10-

47.     With respect to appraisals, the Loan Policy required that "All appraisal reports prepared for the Bank for all purposes . . . will be prepare[d] on an 'as is' basis. Market value 'as is' is defined as an estimate of the market value of the subject property in the condition observed on the date of inspection, and as it physically and legally exists without hypothetical condition, assumptions or qualifications, as of the date of inspection." "For all valuations, the required value estimate is the 'as is' market value of the fee simple or leased fee estate. Any other relevant values (e.g., 'as stabilized,' 'as repaired' etc.) should be included and separately identified as appropriate."

48.     For proposed construction projects, the Loan Policy stated that "The appraisal should reflect the prospective future market value estimate upon completion of construction, which means the prospective value of the subject property on the date the construction is completed, based upon market conditions forecast to exist as of the completion date."

49.     Pursuant to the Bank's DLC Charter, the DLC was tasked with "monitor[ing] the Bank's loan approval process and its loan review system. The DLC then ensures that the policies are followed and that the process is effective." The DLC was to be "composed of a minimum of four [non-officer] members of the Board of Directors."

50.     Under the OLC Charter, the OLC's "primary objective . . . is to approve loans, establish, review, monitor and recommend credit policy for the Bank." The OLC was also required to "monitor[] compliance with the credit policy document." The OLC was comprised of the CCO, who is the Chair of the Committee, the CEO, the CLO and designated loan officers.

51.     The underwriting and approval of the Loss Loans, as well as numerous other acts of gross negligence, breaches of fiduciary duty and/or other legal duties by the Defendants, were the direct and proximate cause of the Bank's losses.

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY
13862424

## C.   DEFENDANTS IMPROVIDENTLY VOTED TO APPROVE NINE LOANS IN THE TOTAL AMOUNT OF $143.5 MILLION IN DISREGARD OF SOUND BANKING PRINCIPLES AND THE BANK'S OWN LENDING POLICY

### 1.   The Nine Loss Loans

52.     The nine Loss Loans consist of four CRE and ADC participation loans with CTB all approved on the same day, September 25, 2006, and five other CRE and ADC loans, four of which were participations, approved from March 27, 2006, through July 24, 2007.

53.     The CTB loans were part of a $117.1 million package of eight loan participations with CTB that Rosa, who was CTB's CCO at the time, had referred to Lannan. Lannan voted to approve the purchase of the CTB loan participations, despite the fact that he stood to benefit personally from the approval of the loans. In fact, Lannan received a $75,000 referral fee from the Bank for referring the participations to the Bank. FBBH hired Rosa immediately after the Board approved the CTB participations.

54.     Numerous violations of the Bank's Loan Policy are apparent on the face of the Credit Memos for all nine Loss Loans. Because only the River East bridge loan was financing for an "income producing property," eight of the nine Loss Loans were prohibited outright by the Loan Policy. Additional deficiencies included ignoring discrepancies in financial evaluations, excessive LTV ratios, ignoring discrepancies in analyses of project financials and appraisals, and prohibited reliance on the due diligence of participant banks. Yet the Approving Defendants, with willful ignorance and without reasonable inquiry, voted to approve all of the nine Loss Loans.

55.     No Defendant voted against any of the Loss Loans. King in one instance (as noted in the table below) abstained from voting on one loan. Some of the Defendants failed to attend certain meetings and thus did not vote on loans presented at

///

///

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY

13862424

these meetings.[2]

56.    The FBBH Credit Memos provided to the Approving Defendants prior to a vote on each of the nine loss loans were facially deficient; as such, the Approving Defendants were not entitled to rely upon them.

57.    The Loss Loans are as follows, by date made:

| Borrower | Final Approval Date | FBBH Loan Amount (in Millions) | Amster (DLC, Board) | Faigin (OLC, DLC, Board) | Glennon (Board) | Kanner (DLC, Board) | Kellogg (Board) | King (DLC, Board) | Kolasinski (OLC) | Lannan (DLC, Board) | Rosa (OLC) | Vecchio (OLC) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Monteverde | Sept. 25, 2006 | $8 | X | X | X | X | X | A | X | X | P | X |
| 2. Otay Ranch | Sept. 25, 2006 | $21.5 | X | X | X | X | X | A | X | X | P | X |
| 3. Schaeffer | Sept. 25, 2006 | $21.5 | X | X | X | X | X | A | X | X | P | X |
| 4. Vineyard So. | Sept. 25, 2006 | $21.5 | X | X | X | X | X | A | X | X | P | X |
| 5. River East | Mar. 27, 2006 | $20 | X | X | X | A | X | X | X | X | P | NV |
| 6. AHCB | Jun. 13, 2006 | $9.75 | X | X | NB | A | NB | X | X | X | X | X |
| 7. Las Vegas 215 | Dec. 19, 2006 | $9.85[3] | X | X | A | X | X | Ab | X | X | X | A |
| 8. Las Vegas Mobil 18 | Jan. 17, 2007 | $17 | X | X | A | X | A | X | X | X | X | X |
| 9. Acacia Investors | Jul. 24, 2007 | $14.425 | X | X | X | A | X | X | X | X | X | X |
| | TOTAL | $143,525,000 | | | | | | | | | | |

Key to Columns Showing Approval of the Loss Loans:
X = Approved                  NB = No Board Approval Required
A = Absent            NV = Non-voting member of OLC
Ab = Abstained        P = Pre-FBBH Employment

58.    The CTB participation loans were underwritten by Defendant Vecchio and approved by the Board, including Amster, Lannan, Kellogg, Faigin, Kanner and Glennon, on September 25, 2006. The loans had been approved by the OLC, including Vecchio, Faigin and Kolasinski, on September 20, 2006. Upon learning that Lannan

---

[2]      Those Defendants approving a given loan are referred to herein as the "Approving Defendants."

[3]      The Board and OLC originally approved a $17.85 million loan for Las Vegas 215. On March 7, 2007, the Bank sold an $8 million share participation to Security Pacific Bank, with FBBH retaining a $9.85 million share.

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY

13862424

voted to approve the CTB participation loans despite the fact that he earned a $75,000 referral fee from the approval of the loans, regulators required that the Board, minus Lannan, ratify the purchase of the CTB participation package.  The ratification took place on October 25, 2007, with Faigin, Amster, Glennon, Kanner, King and Kellogg voting in favor of ratification.

59.    The underwriting deficiencies on the nine Loss Loans include the failure to verify sources of repayment, verify and analyze financials, analyze cash flow, require sufficient collateral, obtain adequate appraisals, sufficiently review environmental and engineering issues, and document loan approvals properly.  Loss Loans (a) through (d), below, were the CTB participation loans, approved on September 25, 2006.  The remaining Loss Loans were approved between March 27, 2006 and July 24, 2007.   At the time of the approval of this loan, Defendant Vecchio was the CCO and responsible for the underwriting of loans.  Defendant Kolasinski was the CLO, and also participated in the underwriting of the CTB loans.  Defendant Faigin was the CEO of the Bank, and in this capacity also participated in the underwriting of these loans.

### a.    Monteverde/Hawkbyrn

60.    The Monteverde/Hawkbyrn loan, which was approved with the other CTB participations, was an $8 million participation in a $9 million CTB loan for real estate investment opportunities and working capital needs on a 23.13 acre vacant property located in the Santa Clarita Valley, an unincorporated area of Los Angeles County. The property had previously been used as a mule farm.  FBBH's lending policy at the time this loan was approved did not allow financing for non-income producing properties.

61.    In approving the loan, the Approving Defendants relied primarily upon CTB's due diligence.  The FBBH Credit Memo, which was received by the Approving Defendants, showed that the Approving Defendants relied on outdated corporate financials, which were dated as of December 31, 2004, outdated financials of the

-14-

1   principal of the borrower, which were dated as of September 2005, and an outdated

2   2004 appraisal.  The FBBH Credit Memo noted that the loan had a maturity date of

3   November 1, 2006, only one month after FBBH entered into the participation, but

4   failed to address why the loan was not being paid off at maturity.

5       62.    Despite FBBH's 88.9% majority participation in the loan, the Approving

6   Defendants did not require, as a condition to the participation, that FBBH obtain lead

7   lender status; rather, CTB retained lead lender status.  As lead lender, CTB had the

8   right to make important decisions concerning the loan without FBBH's approval,

9   putting FBBH in a much riskier position on the loan.

10      63.    According to the CTB Credit Memo received by the Approving

11  Defendants, subordinate mezzanine loans totaling $10 million, retirement of which

12  was conditioned upon sale of certain lots, were outstanding on the property.  There is

13  no indication that these loans were considered at all by the Approving Defendants, or

14  otherwise taken into account in determining the combined LTV, which would have

15  been more than 100% had they been included.  With a combined LTV of 100%, FBBH

16  had insufficient collateral for the loan, especially since the Loan Policy required a

17  maximum LTV ratio of 80%.  The CTB Credit Memo indicated that the financing for

18  the $16.5 million purchase price of the land, which would retire the mezzanine loans,

19  was to be repaid through the sale of units at the Plum Canyon development, another

20  loan in the CTB participation.  Yet, the sale of these lots had not yet occurred.  In fact,

21  the Plum Canyon lots had not been sold, even though the CTB Credit Memo, which

22  was prepared a year earlier, indicated the sales were imminent.  The FBBH Credit

23  Memo did not address this issue.  Moreover, the FBBH Credit Memo did not address

24  how the Hawkbyrn and Plum Canyon loan obligations would *both* be repaid,

25  considering that so much of the Plum Canyon revenue was already earmarked for

26  Monteverde/Hawkbyrn.

27      64.    Despite the clear deficiencies set forth in the FBBH Credit Memo, the

28  Approving Defendants failed to require updated information, failed to require a clear

-15-

repayment source, and failed to require explanations of the deficiencies that would permit them to make a reasonable decision as to the creditworthiness of the borrower. Instead, the Approving Defendants recklessly approved the loan, in violation of the Bank's own Loan Policy and willfully ignoring the clear warning signs that the loan was unsafe and unsound.

65.    Had the Approving Defendants instead required the FBBH underwriters to conduct their own due diligence, as required by the Loan Policy, they would have also discovered that several months earlier, in mid-June 2006, a City of Santa Clarita Planning Department official had told the developers that their project was "too dense and too tall for current planning guidelines," and sent the developers back to the drawing board.

66.    Finally, the CTB Credit Memo mentioned that the property had flood control issues, but the Approving Defendants failed to require the FBBH underwriters to follow up on this issue.  Ultimately, the as-is value of the property was greatly diminished due to these issues, and according to an engineering review conducted after FBBH purchased the loan, the cost of infrastructure required to deal with these issues prior to development would exceed $35 million.

67.    The nonperforming Monteverde/Hawkbyrn loan was sold by the FDIC and has resulted in a loss of $6,129,000.

### b.    Otay Ranch

68.    The Otay Ranch loan, which was approved with the other CTB participations, was a $21.5 million participation in a $24.17 million construction loan to build 48-single family residences at the Otay Ranch Development in Southern California.  Despite FBBH's 88.95% majority participation in the loan, the Approving Defendants did not require, as a condition to the participation, that FBBH obtain lead lender status; rather, CTB retained lead lender status.  In 1988, the guarantors and principals of the borrower ("Principals") purchased the land.  At the time of the CTB deal, the Principals created a new entity to buy the land, essentially from themselves, at

-16-

13862424

1  a price higher than both the appraisal's "as is" value and prospective value for finished

2  lots. This fact, which was contained in the CTB Credit Memo given to the Approving

3  Defendants, and alerted the Approving Defendants that the Principals "flipped" the

4  property at an inflated sales price, was not addressed by the Approving Defendants,

5  and no further due diligence on this issue was requested by the Approving Defendants

6  or conducted by FBBH underwriters.

7      69.    As described in the CTB Credit Memo, the September 30, 2005 financial

8  statement from an individual guarantor, one of the Principals, listed substantial assets,

9  but contained almost no detail or backup for the figures. Further, while the Principal

10  indicated in that financial statement that his percent stake in a corporate guarantor

11  amounted to roughly 23%, the corporate guarantor's financials as of the same date

12  stated that his stake in the company was only 10%. Although this information

13  suggested that the Principal was inflating his assets, these discrepancies were not

14  addressed by FBBH underwriters, including Defendants Vecchio and Kolasinski.

15      70.    The Principals had declared bankruptcy in the early 1990s. The CTB

16  Credit Memo made note of this, but there was no discussion among the Approving

17  Defendants of this fact or of the fact that the individual and corporate financial data

18  was nearly a year old.

19      71.    The FBBH Credit Memo noted that as of the date of the Memo,

20  acquisition of the land was the only cost funded under the loan. Yet, the same Memo

21  stated that the construction costs for the Otay project were expected to be $42 million.

22  There was no indication as to the source of funds to complete construction. The

23  Approving Defendants ignored the market risk that the borrowers would be unable to

24  obtain the necessary construction funding and would be unable to build the residential

25  units, despite the fact that the primary source of repayment was to be the sale of those

26  units. The CTB Credit Memo indicated that residential sales in the subject property's

27  county were down from 2005 and inventory was up in the second quarter of 2006. The

28  interest rate for the loan was set at WSJ prime plus 0.75%, with no floor. The

-17-

1    Approving Defendants did not address the high risk of interest rate exposure.

2        72.    Despite the clear deficiencies set forth in the Credit Memos and the highly

3    speculative repayment source, the Approving Defendants failed to require updated

4    information, or explanations of the deficiencies that would permit them to make a

5    reasonable decision as to the creditworthiness of the borrower and guarantors.  Instead,

6    the Approving Defendants recklessly approved the loan, in violation of the Bank's own

7    Loan Policy and willfully ignoring the clear warning signs that the loan was unsafe and

8    unsound.

9        73.    The "as is" value of the property fell from $18.4 million in a March 2006

10   appraisal to $2.83 million in a March 2009 appraisal.  A notice of default was recorded

11   by CTB on January 14, 2009, and CTB foreclosed on the loan on August 25, 2009.

12       74.    The nonperforming Otay Ranch loan was sold by the FDIC and has

13   resulted in a loss of $15,769,000.

14              **c.    Schaeffer**

15       75.    The Approving Defendants relied upon CTB's due diligence in approving

16   a $21.5 million participation in a $24 million loan for Schaeffer Property, a 107-

17   condominium senior living facility construction loan.  Despite FBBH's 89.58%

18   majority participation in the loan, the Approving Defendants did not require, as a

19   condition to the participation, that FBBH obtain lead lender status; rather, CTB

20   retained lead lender status.  FBBH's lending policy at the time this loan was approved

21   did not allow financing for non-income producing properties or construction loans for

22   building nursing homes or retirement centers.  As indicated in the CTB Credit Memo

23   given to the Approving Defendants, loan repayment was dependent on sales of the

24   residential condominiums.  However, the Approving Defendants ignored the market

25   risk that the residential condominiums would not be sold despite their knowledge of

26   the recent downward trends in area residential sales.

27       76.    In its underwriting of the loan, CTB underwriters had relied upon the

28   guarantors' net worth in assessing repayment, as this was a full recourse loan (in which

-18-

13862424

the guarantors would be responsible for full repayment of the loan if the borrower defaults on its obligation). The Approving Defendants, in turn, relied solely on the CTB analysis. Yet the combined net worth of the borrower and developer stated in the CTB Credit Memo was only approximately $16 million, while FBBH's portion of this loan alone was $21.5 million.

77. CTB's Credit Memo indicated that more than $25 million in loans on earlier phases of the project had already been extended to the borrower and at least $17 million of the earlier loans were also full recourse. Moreover, CTB was the lender on the earlier loans, and retained its full position on those loans despite selling 90% of the last loan in the line to FBBH.

78. The CTB Credit Memo stated the LTV ratio for the collateral, which was the condominiums to be built on the subject property, was 64%, based on the "aggregate retail" valuation of $37.33 million. The "as is" valuation (which was required by FBBH Loan Policy), however, was only $9.35 million, resulting in a LTV ratio of 250%, clearly in excess of the Bank's 80% LTV limit. A lower LTV ratio provides the type of collateral protection that is necessary for a riskier loan. The Approving Defendants' failure to comply with its own requirements on LTV ratio placed the Bank in an unnecessarily risky position and left the Bank without the collateral protection that was needed when the loan defaulted.

79. Despite the entirely speculative repayment source, evidence that the guarantee was wholly insufficient, and lack of collateral, all of which were obvious from the Credit Memos, the Approving Defendants failed to require compliance with the Bank's own Loan Policy, and recklessly approved the loan, willfully ignoring the clear warning signs that the loan was unsafe and unsound.

80. By 2008, the borrower had paid off the first two phases in full, leaving CTB at risk for only the $2.5 million commitment on its participation with FBBH.

81. The precise risk of permitting CTB to remain lead lender on the participation came to pass when CTB, unilaterally and to the detriment of FBBH,

-19-

reduced the amount of the loan's unfunded commitment based on a stated decrease in costs to complete construction.

82.    By 2008, the appraised value for a Bulk Market Sale was $23.4 million, creating a 97.5% LTV.  As of the 2008 RoE, there were no sales, and the borrowers were planning to convert units to rentals.

83.    The Schaeffer nonperforming loan was sold by the FDIC and has resulted in a loss of $12,629,000.

### d.    Vineyard South

84.    The Vineyard South loan, which was approved with the other CTB participations, was a $21.5 million participation in a $24 million ADC loan to construct 94 residential units.  Despite FBBH's 89.58% majority participation in the loan, the Approving Defendants did not require, as a condition to the participation, that FBBH obtain lead lender status; rather, CTB retained lead lender status.  The CTB Credit Memo indicated that the primary repayment source of the loan was sale of the individual residential units released at net proceeds; bulk sale of the units and excess land to an investor; or recourse to the project and its guarantors.

85.    The FBBH Credit Memo, given to the Approving Defendants, stated that construction was 60% complete but that 72% of the loan proceeds had been disbursed, while the CTB Due Diligence Synopsis of August 27, 2006, which Defendants received, described construction as 90% complete.  The CTB Credit Memo given to the same Defendants noted that the subject location "is considered to be somewhat of a pioneering residential development area," but the FBBH Credit Memo stated that "[t]he subject is in the strongest East Riverside submarket for detached home sales."

86.    The CTB Credit Memo further noted a series of delays by the City of Coachella in approving plans for the construction, yet there is no evidence that the Approving Defendants or underwriters ever inquired into the cause of these delays or the status of the City's approval.  At the time, seismic issues were causing delays with the City, and the project was being built on a fault line.  As a result, nearly all pre-sales

-20-

1    were cancelled.

2        87.    The CTB Credit Memo stated that the Vineyard loan was requested to

3    "pay-off" a loan made by Eastern Bank because Eastern Bank had ceased funding

4    construction draws and was unwilling to finance an additional $7.1 million in

5    construction costs.  The Approving Defendants did not question the cost overruns or

6    the reasons for Eastern Bank's refusal to fund further construction draws.

7        88.    FBBH underwriters, including Defendants Vecchio and Kolasinski,

8    conducted no analysis of the seismic issues related to the site, despite the property's

9    proximity to the well-known San Andreas Fault.  An early geotechnical review that

10   CTB provided to the Bank indicated that the property was "situated in one of the more

11   seismically active areas of California and the previous geologic investigation confirms

12   that the San Andreas fault transects the central portion of the site in the north/south

13   direction" and was located within an "Earthquake Fault Zone."  The review also stated

14   that "[d]esign professionals should be aware of the site setting and the potential for

15   earthquake activity during the anticipated life of the structure should be

16   acknowledged."  Although the CTB Credit Memo optimistically stated that "additional

17   environmental investigation appears to be unwarranted," Bank policy required

18   independent due diligence to determine the seriousness of the issue.  Moreover, based

19   on the location of the subject property, it was incumbent upon the Approving

20   Defendants to determine whether seismic issues existed.

21       89.    Despite the indications that the project was not viable, and the clear

22   deficiencies set forth in the FBBH Credit Memo, the Approving Defendants failed to

23   require compliance with the Bank's own Loan Policy, and recklessly approved the

24   loan, willfully ignoring the clear warning signs that the loan was unsafe and unsound.

25       90.    Six months after the Vineyard loan was approved, the interest reserve for

26   the loan was depleted.  In August 2007, a notice of default was recorded.

27       91.    The nonperforming Vineyards loan was sold by the FDIC in a pool sale

28   and has resulted in a loss of $17,626,000.

e.      **River East**

92.     This $20 million, 71.4% participation in a $28 million loan was purchased from Geneva Leasing Associates ("Geneva") in June 2006.  The OLC, including Kolasinski, and DLC, including Faigin, Lannan, King, Amster and Kanner, approved the loan on March 27, 2006.  The Board, including King, Faigin, Lannan, Amster and Kellogg, approved the loan on March 28, 2006.  Defendants Kolasinski and Faigin, in their capacities as CLO and CEO of the Bank, respectively, participated in the underwriting of this loan.  As indicated in the Credit Memo given to the Approving Defendants, River East was a one year bridge loan, with a guaranteed one year extension, for the purpose of refinancing outstanding debt for a 7-story, 475,000 square foot mixed-use office/retail building, in Chicago, Illinois and conversion of certain floors into residential loft condos.  The loan was to refinance $25.4 million in senior and mezzanine debt already outstanding, plus funds for soft costs and debt service.  The Credit Memo did not describe the primary repayment source of the loan.  The Project Overview attached to later FBBH loan modifications, however, indicates that the primary repayment source for the loan was to be via refinancing the retail and office space from slip level to the third floor, or proceeds from a construction loan to be used to facilitate the proposed condominium conversion project.

93.     Despite FBBH's 71.4% majority participation in the loan, the Approving Defendants did not require, as a condition to the participation, that FBBH obtain lead lender status; rather, Geneva retained lead lender status until January 29, 2009, when servicing was transferred to FBBH.

94.     As indicated in the Credit Memo, the subject property was located in Chicago, Illinois, outside the lending area identified in the Bank's lending policy, which had the effect of adversely impacting the Bank's ability to adequately monitor the loan.  Moreover, neither the underwriters nor the Approving Defendants had any expertise in the Chicago market that would enable them to evaluate the project's viability.

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY

13862424

95.     In internal Bank correspondence received by Defendants Kolasinski and Vecchio, the Bank's chief appraiser discussed concerns with the valuation for the project provided by Geneva.  The chief appraiser noted that the appraisal did not include costs necessary to complete the project, including tenant improvements or leasing commissions for moving office tenants within the building.  The Bank's chief appraiser discussed this issue with the appraiser hired to value the property, who indicated that these costs would be incurred and would be quite high, but Geneva had instructed that these costs not be included in the appraisal.  In addition, there were contradictions in the plans Geneva submitted to the Bank and to the appraiser.  Plans to build an additional floor (thus increasing the number of condos to be built) were provided by Geneva to FBBH, but not provided to the appraiser.  When FBBH underwriters provided those plans to the appraiser, the appraiser informed FBBH that adding a floor might not be possible because, given the project's zoning, the building was already at maximum height.  No update or detailed cost estimates were obtained.

96.     The chief appraiser also commented to Defendants Vecchio and Kolasinski that the subject's value would be negatively impacted by a loss of parking. Defendants Vecchio and Kolasinski, despite then serving as CLO and CCO, respectively, did not follow up on the parking issue.  While the property had no parking, there was supposedly an agreement with an adjoining property, although no written agreement was provided to the Bank and the nature of that agreement was unclear.  The FBBH Credit Memo indicated that the building had no parking.  While the Credit Memo indicated that a partial guarantor on the loan owned parking spots next door and that parking spaces owned by the guarantor would be offered for sale to unit buyers within the proposed condo conversion projects, there was no indication that the borrower had any sort of firm commitment for that arrangement.  The Approving Defendants did not seek clarification on this issue prior to approval.

97.     Despite the clear deficiencies set forth in the FBBH Credit Memo, the Approving Defendants failed to require compliance with the Bank's own Loan Policy,

-23-

1  and instead recklessly approved the loan, willfully ignoring the clear warning signs

2  that the loan was unsafe and unsound.

3       98.    The loan was extended and modified numerous times between April 2007

4  and July 2008.  Upon default, a foreclosure was filed on the property in February 2009.

5       99.    The nonperforming loan was sold by the FDIC and resulted in a loss of

6  $11,180,000.

7         **f.    AHCB**

8       100.   In June 2006, FBBH purchased a $9.75 million participation interest in

9  this $10.75 million loan from Geneva.  The participation was approved by the OLC,

10  including Vecchio and Kolasinski, on June 12, 2006 and the DLC, including Lannan,

11  Amster, Faigin and King, on June 13, 2006.  At the time of the approval of this loan,

12  Defendant Vecchio was the CCO and responsible for the underwriting of loans.  As

13  indicated in the Credit Memo provided to the Approving Defendants, the loan was to

14  be used for construction of a 36-unit condominium town home development in Napa,

15  California.  The primary source of repayment was the sale of the subject units.  Despite

16  FBBH's 90.7% majority participation in the loan, the Approving Defendants did not

17  require, as a condition to the participation, that FBBH obtain lead lender status; rather,

18  Geneva retained lead lender status.

19       101.   Banks sometimes place conditions on loans that must be met prior to

20  funding the loan; this is intended to provide an extra layer of protection on riskier

21  loans.  According to the June 13, 2006 minutes of the DLC, the DLC conditioned the

22  loan upon receipt of "hard" purchase contracts (i.e., finalized contracts to purchase

23  condominium units) totaling $10 million prior to loan funding.  However, the DLC

24  ignored the very condition they themselves implemented to mitigate risk by pre-

25  approving funding of $3.8 million of the loan prior to the receipt of any executed

26  purchase contracts.

27       102.   Much of the June 12, 2006 Credit Memo was pasted together from

28  marketing materials received from Geneva.  The Credit Memo stated that site work as

13862424

of June 1, 2005 was approximately 50% complete.  Yet, the Credit Memo stated that as of the date of the Memo – a year after the site work was allegedly 50% complete – "Zoning approval and site-work permits are in place and site development is ongoing."  There was no discussion by the Approving Defendants as to how much more site work needed to be accomplished.

103.   The June 12, 2006 Credit Memo listed as weaknesses that (1) this was FBBH's first project in the Napa, California market, (2) the borrower had no hard dollar equity in the project, and (3) the guarantor "holds all of his assets in multiple trusts, making recourse to his guaranty difficult."  These issues were not addressed by the Approving Defendants.

104.   Despite the clear deficiencies set forth in the FBBH Credit Memo, the Approving Defendants failed to require compliance with the Bank's own Loan Policy, and recklessly approved the loan, willfully ignoring the clear warning signs that the loan was unsafe and unsound.

105.   Soon after the loan was approved, the borrower requested an additional advance of $500,000.  FBBH loan officers were opposed to the request, preferring to wait until the project was closer to completion.  The risk of permitting a minority lender to serve as lead lender came to pass when Geneva, who the Approving Defendants had permitted to remain as lead lender, ignored FBBH's wishes, and on September 21, 2006 allowed the borrower to take an additional advance.  Subsequently, on November 15, 2006, the Bank was forced to approve an increase of the loan by $500,000 to cover the excess building fees.  Kolasinski, Faigin and Vecchio approved this request.

106.   A second trust deed was placed on the property on or about August 9, 2007; this transaction was approved by Faigin, Vecchio, Kolasinski and Rosa.  On January 24, 2008, FBBH approved a $200,000 increase in the loan to cushion the borrower's cost overruns, $100,000 of which was to be funded by FBBH.  Approvals for these modifications were made by Faigin, Vecchio and Kolasinski.

-25-

107. A Default Notice was sent in March 2008. The borrower filed for Chapter 11 on July 3, 2008 to stay foreclosure. $3,601,000 in reserves was charged off as of December 31, 2008.

108. The nonperforming loan was sold by the FDIC and has resulted in a loss of $7,275,000.

### g.     Las Vegas 215

109. On December 19, 2006, the Board, including Amster, Lannan, Faigin and Kanner, approved a $17.85 million loan for Las Vegas 215, LLC on raw land, which was to be used by the borrowers to pay off existing loans. The OLC, including Faigin, Rosa and Kolasinski, approved the loan on December 18, 2006. On March 7, 2007, the Bank sold an $8 million share participation to Security Pacific Bank, with FBBH retaining a $9.85 million share. As indicated in the Credit Memo provided to the Approving Defendants, dated December 12, 2006, property was to be sold "as is" in order to pay off the FBBH loan. At the time of the approval of this loan, Defendant Vecchio was the CCO and responsible for the underwriting of loans.

110. The Credit Memo stated that the property was under a "verbal agreement" for sale, and the purchaser allegedly intended to build a five-story hotel and casino. Despite the allegedly imminent "sale," the loan was granted for a term of two years with a one year extension option. In addition, written verification of this "sale" from the prospective purchaser was not demanded by the Approving Defendants as a condition of the loan and was never obtained, and the "sale" ultimately fell through.

111. As indicated in the Credit Memo, the original appraisal, dated August 28, 2006, valued the property at $47.9 million. Upon information and belief, this number seems to have been derived from the alleged $47 million verbal sale price. Later appraisals fell to as low as $9 million in a valuation dated June 8, 2009.

112. The Credit Memo noted that interest reserves of $3,480,750 were built into the loan. The Approving Defendants failed to request, and management failed to perform, any cash flow analysis on the guarantor to see if the borrower could meet the

-26-

13862424

loan carry costs; instead, the Approving Defendants seemed to rely solely on the interest reserve to service the loan. This use of interest reserves was improper and ultimately the borrower was unable to carry the property on a long term basis.

113.   Despite the speculative repayment source and clear deficiencies set forth in the FBBH Credit Memo, the Approving Defendants failed to require compliance with the Bank's own Loan Policy, and recklessly approved the loan, willfully ignoring the clear warning signs that the loan was unsafe and unsound.

114.   The nonperforming loan was sold by the FDIC and has resulted in a loss of $9,092,644.

### h.      Las Vegas Mobil 18

115.   On January 17, 2007, the Board, including Amster, Lannan, Faigin, Kanner and King, approved a $29 million loan on land in Las Vegas, Nevada to refinance and pay off the borrowers' then-existing loans and provide an interest reserve. Defendant Kolasinski was the loan officer and recommended approval of the loan. The OLC, including Vecchio, Rosa and Kolasinski, approved the loan on January 16, 2007. As indicated in the Credit Memo provided to the Approving Defendants, dated January 10, 2007, the property was purportedly intended to be used as a commercial mixed-use high rise project. The Credit Memo indicated that repayment would come either from a later-obtained construction loan or sale of the property, but contained no analysis of the possibility of a sale or of the borrowers' ability to obtain a construction loan. At the time of the approval of this loan, Defendant Vecchio was the CCO and responsible for the underwriting of loans.

116.   The Credit Memo noted that a mobile home park was located on the property, but also noted that the loan had been underwritten as a land loan since monthly income from the mobile home park was insufficient to service the loan. The Credit Memo further stated that an interest reserve of $5.6 million had been included to supplement the interest shortfall during the term of the loan.

117.   The January 4, 2007 appraisal referenced in the Credit Memo valued the

-27-

subject land only (a "hypothetical as though vacant" valuation).  No "as is" valuation was made, as required by the Bank's Loan Policy.  The hypothetical appraisal valued the subject property at $108 million, assuming all of the mobile homes had been removed and tenants moved, as noted above, and included a deduction of $2 million for estimated relocation expenses from the value of the subject in reaching his valuation.  The Approving Defendants knew that this property was analyzed as a land-only loan, despite the presence of a mobile home park on the site.  The appraisal report contained multiple disclaimers, specifically noting that the hypothetical valuation was a direct contradiction, since the subject property was not vacant and development-ready due to the mobile park.  While the Credit Memo also indicated that the appraiser had deducted $2 million from his valuation for estimated relocation costs, there was no indication as to whether the sales comparisons were vacant land or also had existing structures.

118.   Based on continued use of the property as a mobile home park, the value of the property – assessed in 2008 at $9.8 million – was more than ten times lower than the valuation used as a basis for the loan.  Using this lower valuation, the actual LTV of the loan was 270%.

119.   Had the Approving Defendants inquired into the issues raised in the Credit Memo concerning the hypothetical valuation, they would have learned that a January 11, 2007 peer appraisal review of the valuation, commissioned by FBBH, raised numerous concerns and submitted recommendations for the Bank to perform due diligence.  The Bank's chief appraiser confirmed to regulators in 2008 that no diligence was conducted before approval.

120.   The Credit Memo noted that the borrower would be required to apply for a conversion from its existing use to a new use prior to development, and to obtain a new zoning designation for the contemplated development.  The Approving Defendants made no inquiry into the likelihood that a conversion could be obtained or how failure to obtain a new zoning designation would affect the value of the property.

13862424

121.   The Approving Defendants ignored regulatory warnings provided only days earlier regarding their poor underwriting, and the clear deficiencies set forth in the FBBH Credit Memo, failed to require a clear repayment source, and failed to require compliance with the Bank's own Loan Policy.  Instead, the Approving Defendants recklessly approved the loan, willfully ignoring the clear warning signs that the loan was unsafe and unsound.

122.   The borrower never satisfied any of the needed development conditions, and continued to operate the site as a mobile home park after acquiring the property.

123.   By 2008, the borrower still had not obtained any zoning changes for the subject property, as originally intended.  While the fact that the property was subject to mixed use overlay district ("MUD-1") (a neighborhood development plan in Clark County which was intended to encourage a diversity of compatible land uses) had been touted as a basis for a high hypothetical valuation on the property, it did not constitute a zone change, and, according to an August 25, 2008 appraisal, added only nominal value to the property.

124.   $10,502,000 in reserves were charged off on this loan prior to failure.

125.   The nonperforming loan was sold by the FDIC and has resulted in a loss of $11,824,000.

### i.   Acacia Investors

126.   In June 2007, FBBH granted a $15 million loan (reduced on July 31, 2007, prior to funding, to $14.425 million) to Acacia Investors, LLC to finance a senior housing development.  At the time of the approval of this loan, Defendant Vecchio was the CCO and responsible for the underwriting of loans.  The loan was approved by the OLC, including Vecchio, Faigin, Rosa and Kolasinski, on July 17, 2007, and the Board of Directors, including Amster, Lannan, Faigin, Glennon and King, on July 20, 2007.  The Credit Memo provided to the Approving Defendants indicated that the purpose of the loan was to pay off the borrowers' then-existing loans and to obtain approvals and entitlements from the City of Carlsbad in order to develop

-29-

13862424

1    a 468-unit condominium project on former farm land.  The majority of the project (438

2    units) was designated for senior residences.

3        127.  The Credit Memo noted that repayment was to come from sale of the

4    property after the entitlements were obtained and a tentative tract map was completed.

5    The loan was funded on August 13, 2007.

6        128.  FBBH's lending policy at the time the loan was approved did not allow

7    financing for non-income producing properties such as land development.

8        129.  The Credit Memo stated the loan would include a $2.7 million interest

9    reserve because of the lengthy timeframe for entitlement and processing during which

10   no income would be generated from the property.

11       130.  The Credit Memo noted that the Phase I Site Assessment, dated April 18,

12   2006, recommended pesticide sampling to assess the presence of agricultural

13   chemicals at the Site.  A June 12, 2007 peer review concurred with this finding.  The

14   chief appraiser at the Bank recommended this testing be conducted.  However, the

15   borrower did not want to do any testing for pesticides at that time, and no

16   environmental assessment was conducted.  FBBH underwriters ordered no

17   independent testing or other environmental diligence on the subject land.  The

18   Approving Defendants did not demand that the recommendations from the Phase I Site

19   Assessment be fulfilled as a condition to loan approval.

20       131.  Had an environmental assessment been performed as a condition of loan

21   approval, underwriters and the Approving Defendants would have learned of

22   restrictions on the property due to the Endangered Species Act.

23       132.  Rather, the FDIC later learned from the borrower, through the manager of

24   the project, that only 20 acres of the property was buildable, and that any development

25   would require consultation with US Fish and Wildlife Service due to the Endangered

26   Species Act.

27       133.  As stated in the Credit Memo, also impacting the viability of the project

28   was the fact that, as a condition of the City issuing a tentative map, the property

-30-

owners had agreed to assist the City in funding and connecting a missing segment of a nearby road, as well as a 400 foot bridge over the undeveloped canyon.

134.   There was no discussion at the approver level of the impact upon the viability of the project of the need to construct the bridge and/or the cost and potential delay related to such an undertaking.

135.   The Approving Defendants ignored regulatory warnings regarding their poor underwriting, the clear deficiencies set forth in the FBBH Credit Memo, including the speculative repayment source and questionable viability of the project, failed to require compliance with the Bank's own Loan Policy, and recklessly approved the loan, willfully ignoring the clear warning signs that the loan was unsafe and unsound.

136.   The nonperforming loan was sold by the FDIC and has resulted in a loss of $9,175,050.

137.   Notwithstanding the evident risks, each of the nine Loss Loans was approved by members of the Board, the DLC and/or the OLC.  Had the Approving Defendants insisted on compliance with lending policies and safe and sound banking principles, and, for two of the nine loans, heeded regulatory warnings, these loans would not have been made.

138.   As a result of the improper approvals by the Board, DLC and/or OLC, which constitute negligence, gross negligence and breach of fiduciary duty, the FDIC-R has suffered losses on these nine Loss Loans in an amount to be proven at trial but expected to exceed $100.6 million.

## VI.   **CLAIMS FOR RELIEF**

### **FIRST CLAIM FOR RELIEF – NEGLIGENCE**
### **(AGAINST KOLASINSKI, VECCHIO, ROSA, FAIGIN AND LANNAN)**

139.   Plaintiff realleges and incorporates by reference each of the allegations

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY

13862424

1    contained in paragraphs 1-138 of this Complaint, as though fully set forth herein.

2        140.   The Officer Defendants, Vecchio, Kolasinski and Rosa, during the period

3    of time each was an officer of the Bank, as well as Officer and Director Faigin, acting

4    in his capacity as CEO of the Bank, owed to FBBH the duty to use reasonable care,

5    skill and diligence in the performance of their duties, especially in connection with the

6    Bank's commercial real estate lending functions.  These duties included, but were not

7    limited to, the following:

8            a.   To inform themselves about proposed loans and the risks the loans

9                 pose to the Bank before they approved them;

10           b.   To approve loans that conformed with the Bank's Loan Policy;

11           c.   To ensure that any loans they approved were underwritten in a safe

12                and sound manner;

13           d.   To ensure that any loans they approved were secured by

14                sufficiently valuable collateral to prevent or minimize the risk of

15                loss to the Bank; and

16           e.   To ensure that any loans they approved did not violate applicable

17                banking regulations and/or create unsafe and unsound

18                concentrations of credit.

19       141.   Defendant Lannan owed to FBBH the duty to not approve loans for which

20   he would obtain financial benefit.

21       142.   Each of the Officer Defendants, Vecchio, Kolasinski, and Rosa, during

22   the period of time they were officers of the Bank, as well as Faigin, acting in his

23   capacity as CEO of FBBH, was negligent in abdicating his/her responsibilities to the

24   Bank as officers, unreasonably failing to investigate material facts, failing to use

25   his/her business judgment in carrying out his/her responsibilities to the Bank by failing

26   to act with such care, including reasonable inquiry, as an ordinarily prudent person in a

27   like position would use under similar circumstances, failed to act in good faith,

28   ignoring the danger the negligence was causing to the Bank, negligently underwriting,

-32-

recommending, and approving loans contrary to safe and sound banking practices, as further described in this Complaint, in connection with the Bank's commercial lending functions. These breaches of duty are exemplified by the Loss Loans described herein.

143.   Defendant Lannan was negligent in affirmatively voting in favor of approving the CTB loans and then accepting a financial benefit in connection with those same loans, in the form of referral fees for bringing the CTB loans to FBBH.

144.   As a direct and proximate result of Kolasinski, Vecchio, Faigin and Rosa's negligence, the FDIC-R suffered damages in an amount to be proven at trial, in excess of $100.6 million.

145.   As a direct and proximate result of Defendant Lannan's negligence, the FDIC-R suffered damages in an amount to be proven at trial, in excess of $52 million.

## SECOND CLAIM FOR RELIEF – GROSS NEGLIGENCE
### (AGAINST ALL DEFENDANTS; IN THE ALTERNATIVE AGAINST DEFENDANTS KOLASINSKI, VECCHIO, ROSA, FAIGIN AND LANNAN)

146.   Plaintiff realleges and incorporates by reference each of the allegations contained in paragraphs 1-145 of this Complaint, as though fully set forth herein.

147.   Section 1821(k) of FIRREA holds directors or officers of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law. California law defines gross negligence as either a want of even scant care or an extreme departure from the ordinary standard of care.

148.   As DLC members, OLC members, officers and/or directors, Defendants owed FBBH a duty of care to carry out their responsibilities by exercising the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances. This duty of care included, but was not limited to, the following:

   a.   To inform themselves about proposed loans and the risks the loans pose to the Bank before they approved them;

-33-

b.  To approve loans that conformed with the Bank's Loan Policy;

c.  To ensure that any loans they approved were underwritten in a safe and sound manner;

d.  To ensure that any loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and

e.  To ensure that any loans they approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.

149.   For each of the Loss Loans approved by each Defendant in their roles on the OLC, DLC and/or Board of Directors, Defendants, through their gross negligence, breached their duties of care by, among other things, failing to exercise even scant care or acting in a manner constituting an extreme departure from the ordinary standard of care by:

a.  Causing the Bank to make CRE and ADC loans without proper analysis of borrowers' ability to repay them;

b.  Failing to inform themselves about the risks the Loss Loans posed to the Bank before they approved them;

c.  Approving the Loss Loans with terms inconsistent with the Bank's Loan Policy;

d.  Failing to ensure that the Loss Loans were underwritten in a safe and sound manner;

e.  Failing to ensure that the Loss Loans were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

f.  Failing to ensure that the Loss Loans did not violate applicable banking regulations or create unsafe and unsound concentrations of credit; and

-34-

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY

13862424

1        g.  Failing to take action to prevent the reoccurrence of any unsafe or

2            unsound banking practice that came to their attention.

3      150.   In addition, Defendants breached their duties and were grossly negligent

4  in connection with each loan for which they participated in the approval process by

5  voting to approve one or more of the loans identified in the chart in paragraph 57

6  above, because they knew or should have known that each such loan involved one or

7  more of the following characteristics, which increased the risk of default:

8        a.  A non-income producing property, in violation of FBBH's own

9           Loan Policy;

10       b.  An excessive LTV ratio, as measured by applicable regulatory

11          standards and FBBH's own Loan Policy;

12       c.  A deficient or incomplete appraisal, or an appraisal that deemed the

13          project unfeasible, despite warnings from examiners that FBBH

14          must comply with minimum appraisal standards;

15       d.  Permitting minority participation partners to be retained as lead

16          servicers on participation loans;

17       e.  Improper use of interest reserves;

18       f.  Reliance on participant bank due diligence and/or broker

19          representations in lieu of independent diligence, in violation of

20          FBBH's own Loan Policy;

21       g.  Deficient or inadequate environmental and engineering analyses;

22       h.  A borrower or guarantor (or both) with excessive liabilities, or who

23          otherwise lacked the financial wherewithal to service the loan;

24       i.  Insufficient proof of pre-sales and/or necessary market demand; or

25       j.  Insufficient collateral.

26      151.   Each Defendant was grossly negligent in that his or her manner of

27  carrying out his or her duties and responsibilities to the Bank constituted a want of

28  even scant care or an extreme departure from the ordinary standard of care, as further

13862424

1    described in this Complaint.

2         152.   As a direct and proximate result of these Defendants' gross negligence,

3    the FDIC-R suffered damages in an amount to be proven at trial, in excess of $100.6

4    million.

5

6         **THIRD CLAIM FOR RELIEF – BREACH OF FIDUCIARY DUTIES**

7         **(IN THE ALTERNATIVE AGAINST ALL DEFENDANTS)**

8         153.   Plaintiff realleges and incorporates by reference each of the allegations

9    contained in paragraphs 1-152 of this Complaint, as though fully set forth herein.

10        154.   In the alternative, during all or part of the relevant times, Defendant

11   Faigin was an officer and director of FBBH who served on the DLC and OLC.

12   Defendants Kolasinski, Rosa, and Vecchio were officers of FBBH, who served on the

13   OLC.  Defendants King, Amster, Kanner and Lannan were directors of FBBH who

14   served on the DLC.  Directors Glennon and Kellogg were directors of FBBH.

15        155.   As DLC members, OLC members, officers and/or directors, Defendants

16   owed fiduciary duties of care and loyalty to FBBH to act with the utmost care and in

17   the best interests of the Bank, which included supervising management in the design,

18   implementation, and operation of lending policies to protect the Bank against

19   excessive risk.  That duty, in turn, included but was not limited to a duty to ensure that

20   management designed and implemented lending policies that complied with safe and

21   sound lending practices including the following duties:

22        a.    To adopt such careful, reasonable and prudent policies and

23              procedures, including those related to lending and

24              underwriting, as required to ensure that the Bank did not

25              engage in unsafe and unsound banking practices, and to

26              ensure that the affairs of the Bank were conducted in

27              accordance with these policies and procedures;

28

-36-

b. To communicate to the Bank's loan officers and underwriters a clear expectation that they must adhere to sound lending policies and credit underwriting by establishing a system of checks and balances and by careful monitoring of loan officers' conduct;

c. To require that sufficiently detailed, current and reliable information be provided upon which the directors and officers could make prudent decisions, including the use of current technology and internal control procedures to timely identify problems and allow for early remediation;

d. To support and foster the Bank's internal risk management functions;

e. To enforce policies and procedures designed to ensure that loans would not be made based on inadequate or inaccurate information;

f. Upon receiving notice of an unsafe or unsound practice, to make a reasonable investigation thereof and to exercise reasonable business judgment with respect to all facts that a reasonable investigation would have disclosed, by acting with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances;

g. To carefully review reports of examinations and other directives of regulatory agencies, to carry out the instructions and orders contained in those reports, to investigate and cure problems noted therein, and to prevent any repetition of such problems and deficiencies;

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY

13862424

h.    To conduct FBBH's business in compliance with all applicable state and federal laws and regulations;

i.    To inform themselves about proposed loans and the risks the loans posed to the Bank before they determined whether to approve them;

j.    To ensure that loans which required approval pursuant to the Loan Policy were sent through the correct approval process;

k.    To properly supervise the lending function and lending program;

l.    To approve only those loans that conformed with the Bank's Loan Policy;

m.    To ensure that any loans they approved and/or ratified were underwritten in a safe and sound manner;

n.    To ensure that loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

o.    To ensure that the Bank had sufficient, capable personnel to undertake and administer the lending policies; and

p.    To ensure that any loans they approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.

156.    Defendants breached their fiduciary duties by, among other things:

a.    Failing to ensure that the design, implementation and operation of the Bank's lending policies met appropriate standards;

b.    Adopting and/or implementing unreasonable and imprudent lending and underwriting policies and procedures that

-38-

13862424

amounted to unsafe and unsound banking practices with
respect to loans in the Bank's portfolio;

c.    Causing the Bank to make commercial real estate loans with
little or no regard for borrowers' ability to repay them;

d.    Failing to ensure proper review and approval of participation
loans, which comprised a significant portion of the Bank's
total loan portfolio;

e.    Failing to ensure that loans, including the Loss Loans, were
underwritten in a safe and sound manner;

f.    Failing to ensure that loans, including the Loss Loans, were
secured by sufficiently valuable collateral to prevent or
minimize the risk of loss to the Bank;

g.    Failing to take all necessary actions upon loan approval to
ensure that the Bank obtained and monitored its security
interests in the collateral securing loans, including the Loss
Loans;

h.    Failing to ensure that lending procedures, including those
utilized in regard to the Loss Loans, did not violate
applicable banking regulations or create unsafe and unsound
concentrations of credit; and

i.    Failing to take action to prevent the reoccurrence of any
unsafe or unsound banking practice that came to their
attention.

157.    In committing the foregoing breaches, the Defendants acted clearly
unreasonably under the circumstances known to them at the time, and otherwise
wholly abdicated their corporate responsibilities by closing their eyes to known risks,
did not act in good faith and did not act with the belief that their actions were in the
best interests of the Bank.

13862424

1    158.   Defendant Lannan breached the duty of loyalty owed to FBBH by

2  affirmatively voting in favor of approving the CTB loans and then accepting a

3  financial benefit in connection with those same loans in the form of referral fees for

4  bringing the CTB participation loans to FBBH.

5    159.   As a direct and proximate result of Defendants' breach of fiduciary duties,

6  the FDIC-R suffered damages in an amount to be proven at trial, in excess of $100.6

7  million.

8  ///

9  ///

10  ///

11  ///

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY

13862424

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff the FDIC-R requests relief from Defendants as follows:

       A.     For compensatory and consequential damages, jointly and severally, in a minimum amount of $100.6 million and any excess amount to be proven at trial;

       B.     For its costs of suit against all Defendants;

       C.     For prejudgment interest;

       D.     For attorneys' fees, and costs for the investigation and litigation;

       E.     For such other and further relief as this Court deems just and proper.

DATED:  April  20, 2012

Respectfully submitted,

NIXON PEABODY LLP

By: _____
Anthony J. Barron
Stephanie A. Karnavas
Attorneys for Plaintiff
FEDERAL DEPOSIT INSURANCE
COMPANY AS RECEIVER FOR
FIRST BANK OF BEVERLY
HILLS

-41-

13862424

1

## **DEMAND FOR JURY TRIAL**

2          Plaintiff the FDIC-R hereby demands trial by jury in this action.

3

4     DATED: April  20, 2012                    NIXON PEABODY LLP

5

6                                               By:

7                                               Anthony J. Barron
                                                Stephanie A. Karnavas
8                                               Attorneys for Plaintiff
                                                FEDERAL DEPOSIT INSURANCE
9                                               COMPANY AS RECEIVER FOR
                                                FIRST BANK OF BEVERLY
10                                              HILLS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY

13862424

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dean D. Pregerson and the assigned discovery Magistrate Judge is Carla Woehrle.

The case number on all documents filed with the Court should read as follows:

## CV12- 3448 DDP  (CWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Anthony J. Barron (CBN 150447)
Stephanie A. Karnavas (CBN 255596)
NIXON PEABODY LLP
555 West Fifth Street, 46th Floor
Los Angeles, CA 90013
Tel. 213-629-6000; Fax 213-629-6001
abarron@nixonpeabody.com
skarnavas@nixonpeabody.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE COMPANY AS RECEIVER FOR FIRST BANK OF BEVERLY HILLS, <br><br> PLAINTIFF(S) <br><br> v. <br><br> LARRY B. FAIGAN, CRAIG KOLASINSKI, ERIC ROSA, ANNETTE VECCHIO, HOWARD AMSTER, WILLIAM D. KING, STEPHEN GLENNON, ROBERT KANNER, KATHLEEN KELLOGG AND JOHN LANNAN, <br><br> DEFENDANT(S). | CASE NUMBER <br><br> CV12 03448 DDP (CWx) <br><br> SUMMONS |

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within     21     days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, <u>Anthony J. Barron</u>, whose address is <u>555 West Fifth Street, 46th Floor, Los Angeles, CA 90013</u>. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:     4/20/12

By: _____
Deputy Clerk

(Seal of the Court)

1181

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

American LegalNet, Inc.
www.FormsWorkFlow.com

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)

FEDERAL DEPOSIT INSURANCE COMPANY AS RECEIVER FOR FIRST BANK OF BEVERLY HILLS

**DEFENDANTS**

LARRY B. FAIGAN, CRAIG KOLASINSKI, ERIC ROSA, ANNETTE VECCHIO, HOWARD AMSTER, WILLIAM D. KING, STEPHEN GLENNON, ROBERT KANNER, KATHLEEN KELLOGG AND JOHN LANNAN

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Anthony J. Barron (CBN 150447)
Stephanie A. Karnavas (CBN 255596)
NIXON PEABODY LLP
555 West Fifth Street, 46th Floor, Los Angeles, CA 90013
Tel. 213-629-6000; Fax 213-629-6001

**Attorneys** (If Known)

---

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ |

---

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No    ☒ **MONEY DEMANDED IN COMPLAINT: $** 100,600,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
12 U.S.C. § 1821. Allegations of gross negligence, negligence and breach of fiduciary duty against former directors and officers of failed bank.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☒ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 61 HIA(1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities – Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities – Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

---

**FOR OFFICE USE ONLY:** Case Number: **CV12 03448**

CV-71 (05/08)    CIVIL COVER SHEET    Page 1 of 1

American LegalNet, Inc.
www.FormsWorkflow.com

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No ☐ Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ No ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, **and** one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.

☒ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County (Defendants Faigin, King, Kellogg, Lannan, Rosa); Ventura County (Defendant Kolasinski) | Connecticut (Defendant Glennon); Florida (Defendant Amster); Ohio (Defendant Kanner); Oregon (Defendant Vecchio) |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.

Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties

Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____ Date April 20, 2012

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.co